**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **MINDY BOYD, individually,** ) | |
| **and as guardian of her minor child,** ) | |
| **E.B., on behalf of herself and those** ) | |
| **similarly situated,** ) | |
| ) | **Case No.: 4:19-cv-0674** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JUUL LABS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Mindy Boyd, by and through her attorneys, brings this Class Action Complaint against defendant JUUL Labs, Inc. ("JUUL"), on behalf of herself, and as guardian of her minor child, E.B., and all other similarly situated persons who used a JUUL e-cigarette or related JUUL product in the State of Missouri. Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters based on the investigation of counsel.

### NATURE OF THE CASE

1.      Countless lives have been horribly and irreparably impacted by nicotine use and addiction. For years, cigarette manufacturers managed to effectively market their products as trend-setting and relatively harmless. And perhaps the most effective strategy was the marketing of traditional cigarettes to teenagers. Advertising depicted smokers as cool and attractive, the type of person America's youth looked up to. Cigarette manufacturers knew that teenagers were more susceptible to becoming addicted to nicotine. And if you could addict a 14-year old to smoking, you gained a customer for decades, if they lived that long.

Through studies once concealed but later made public and countless deaths, Americans learned that nicotine was highly addictive and posed serious, often fatal, health hazards. Fortunately, cigarette smoking has been on the decline.

2.    But, where most saw a positive change, others saw opportunity. As Americans became more health conscious, a stigma had grown around smoking traditional cigarettes. Cigarette smoking was no longer cool and the smell of second-hand smoke scattered bystanders. However, the addictive nature of nicotine remained and, to some, presented an opportunity for profit.

3.    Though not alone in pursuing development of electronic cigarettes, JUUL did so with a familiar strategy. Taking a page from big tobacco's playbook, JUUL developed a product and marketing strategy that sought to portray its e-cigarette as trend-setting, stylish and used by the type of people teenagers look up to. In addition to ads eerily similar in scheme and content to those of traditional cigarette manufacturers, JUUL utilized social media extensively, knowing full well that teenagers are the primary users of social media. Like big tobacco, JUUL targeted America's youth, hoping to gain customers for life. And it worked.

4.    Nicotine use amongst America's youth is sharply on the rise. Parents, teachers, health care practitioners and now the U.S. Government are combatting the meteoric rise of vaping amongst teens. E-cigarette use in general increased 78% among high school students and 48% among middle school students in a single year from 2017 to 2018. The FDA Commissioner called these results "astonishing." The Secretary of the U.S. Department of Health and Human Services, Alex Azar, recently stated at a press conference: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

5.      JUUL knew of the significant health risks posed by nicotine use and, with that knowledge, developed an e-cigarette that is more potent than any other.  JUUL was also aware that nicotine has greater adverse impact on adolescents, including an increased risk of becoming addicted to nicotine.  With that knowledge, JUUL developed a marketing strategy that targeted teenagers. This action seeks to hold JUUL accountable for its tortious conduct resulting in serious harm to millions of individuals.

## PARTIES

**Plaintiff**

6.      Plaintiff Boyd is a resident of Clay County, Missouri and is a citizen of the state of Missouri.

7.      Plaintiff is the mother and legal guardian of E.B. who was 14 years-old when she first started using JUUL in 2018.  At first, E.B. thought vaping with JUUL was a cool, fun thing to do.  Over a relatively short period of time, however, E.B. was unable to stop using JUUL.

8.      E.B. now spends roughly half of her paychecks on JUUL every week and she and her friends post pictures of themselves "JUULing" together on social media.

9.      Plaintiff first noticed that something was wrong with E.B. because E.B. started getting sick more and more often and was uncharacteristically irritable and anxious.  E.B. also suffers from frequent headaches.

10.     Plaintiff has also noticed a change in E.B.'s personality.  The relationship between E.B. and Plaintiff has changed and the two often get into arguments.

3

11.     E.B. has tried to stop using JUUL on numerous occasions, but she becomes irritable and anxious without it.  Despite any attempts, she has not been able to quit for very long.

12.     Plaintiff feels helpless as she worries that her daughter's health is deteriorating.

13.     Plaintiff also believes that E.B.'s exposure to nicotine at such a young age has caused E.B. to unknowingly suffer adverse health effects, some of which may presently be latent.

**Defendant**

14.     Defendant JUUL Labs, Inc. ("JUUL"), is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one defendant is a resident of a state other than Missouri.

9.      The Court has personal jurisdiction over JUUL because the acts complained of herein occurred entirely or substantially in the state of Missouri.  Further, JUUL regularly conducts business in Missouri and has engaged in a continuous and systematic course of doing business in Missouri by advertising and selling JUUL products to thousands of Missouri citizens and companies.

4

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

**The E-Cigarette Market and JUUL**

11.     Although big tobacco companies had sought to replicate their success with traditional cigarettes in an electronic cigarette for years, the e-cigarette market began to take substance in 2010.  In 2010, NJoy, an Arizona based company, became the industry's first darling.  By 2013, e-cigarettes had grown to a $1.7-billion-a-year business.  NJoy's mistake, however, was in marketing an e-cigarette product that looked nearly identical to a traditional cigarette.  The stigma that came with being a smoker at this time stymied NJoy's sales, and the company filed for bankruptcy in 2016.

12.     JUUL had also launched an e-cigarette product in 2010.  JUUL's product resembled a fountain pen.  JUUL's design failed to take off and drew only modest revenues: $30 million by 2015.  To attain the multi-billion-dollar success of traditional tobacco, JUUL knew it had to switch gears.  The gear JUUL chose was not new.  Rather, JUUL sought to replicate the financial success of traditional cigarettes by using the same playbook big tobacco used:  design a product attractive to teens and market it directly to teens, thereby gaining customers for life.

13.     In 2015, JUUL launched its current design.  Knowing it need a produced design that would avoid the stigma associated with smoking traditional cigarettes and ultimately appeal to youth, JUUL's revamped product resembled a device commonly found at schools and in backpacks across the country: a USB flash drive.  JUUL's e-cigarettes are small enough

Case 4:19-cv-00674-HFS   Document 1   Filed 08/26/19   Page 5 of 31

to fit in the user's hand—making it easier to conceal their use by, for example, students—and come in stylish designs and colors.

14.     Each JUUL e-cigarette has two components. First, the e-cigarette, which holds the battery and temperature regulation system. The thin, rectangular e-cigarette is made up of an aluminum shell, a battery, a magnet for the USB-charger, a circuit board, an LED light, and a pressure sensor. Second, a pod, marketed as "JUULpods," which contain 0.7 milliliters of JUUL's patented liquid made up of nicotine, glycerol and propylene glycol, benzoic acid, and flavorants. The pod is inserted into the end of the e-cigarette device. When the device senses the movement of air, i.e., the user sucking air through it, the liquid is then heated up, creating a vapor, which quickly dissolves into the air. JUUL describes the e-cigarettes as an "easy to use vaporizer." Unlike the distinct odor produced by cigarette smoke, the odor emitted from a JUUL e-cigarette is a reduced aerosol. Like its sleek, stylish design, the lack of a potent odor enables users to conceal their use and avoid the stigma of being a smoker of traditional cigarettes.

15.     The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls the amount of nicotine vapor delivered. One study determined that there is a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." Another study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."

16.     In addition to its physical design that is appealing to youth and easily concealed, JUUL developed a new way of delivering nicotine, by mixing nicotine with a

6

chemical called benzoic acid. The result is a quicker and stronger delivery of nicotine, which more closely resembles a traditional cigarette. But, medical researchers say it also makes JUUL's product more addictive for youth. And nothing in JUUL's e-cigarettes limits the amount of nicotine each puff delivers to that of a cigarette.

17. Consistent with JUUL's deceptive practices, studies have shown that JUUL e-cigarettes contain higher levels of benzoic acid and nicotine than JUUL represents. Specifically, rather than the 4% benzoic acid solution disclosed in JUUL's patent paperwork, JUUL products have been found to have a benzoic acid solution of 4.5%. Likewise, independent studies have revealed that a single JUULpod contains 6% nicotine or 60 mg/mL of nicotine per JUULpod. JUUL represents that each JUULpod contains 5% or 50 mg/mL.

18. JUUL e-cigarettes and JUULpods deliver toxins and carcinogens that are dangerous to their users, especially teenage users. JUUL delivers doses of nicotine that are materially higher than combustible cigarettes. The United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)." JUUL's nicotine concentration has been found to be 60 mg/ml, and JUUL's salt form increases the rate and efficiency of nicotine delivery. JUULpods therefore substantially exceed the nicotine dose of a traditional cigarette.

19. JUUL is also defective in design because it puts e-cigarette users, particularly adolescents or young adults with developing brains, at an increased risk of experiencing seizures. Furthermore, JUUL's design is defective because users may inadvertently swallow the liquid in the JUULpods. The U.S. Food and Drug Administration ("FDA") is currently

investigating reports of youth and young adults who are experiencing seizures following the use of e-cigarettes.

**The Marketing of JUUL**

20.     With a physical design that appealed to youth and a more powerful and addictive nicotine delivery system, all JUUL was missing was a plan to attract its target audience.  Again, JUUL took a page out of the big tobacco playbook.  According to JUUL co-founder James Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."  Indeed, Monsees has admitted that JUUL studied tobacco industry documents.  In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."  Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019) (the "Stanford Report").  JUUL's "starter kits" cost around $35 in 2015, and a pack of four pods sold for $16—each roughly the same cost as a pack of cigarettes.

21.     JUUL's early marketing was nicknamed "Vaporized" and depicted flirtatiously posed young people holding JUULs.  JUUL's early marketing also included attractive young people distributing free JUULs at movie and music events.  JUUL's advertisements mimicked those of big tobacco and traditional cigarettes, including colorful ad images using eye-catching designs and youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that the JUUL e-cigarettes are "great tasting."  JUULpods came in sweet flavors including mango, fruit medley, cool mint, cool cucumber and crème brulee.  According to one survey, 81% of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.

22.     The highly-successful "Vaporized" campaign was created by JUUL's Creative Director Steven Baillie along with marketing companies Grit Creative, LLC ("Grit") and Cult Collective LP ("Cult Collective").  Cult Collective has admitted the "Vaporized" campaign "created ridiculous enthusiasm."  JUUL's "Vaporized" campaign included no warnings about the risks of nicotine addiction or, remarkably, that JUUL's products contained nicotine.

23.     One way in which JUUL's marketing campaign differed from that of big tobacco in marketing traditional cigarettes was the media JUUL used to reach people.  But this was not an altruistic departure from cigarette advertising.  Rather, it was an improvement in targeting youth, recognizing the power of social media in influencing the lives and habits of today's middle and high school kids.

24.     The Stanford Report analyzed JUUL's marketing campaign between its launch in 2015 and fall 2018.  The researchers scrutinized thousands of social media posts (Instagram, Facebook, Twitter), emails to consumers, and ads (including internet-based ads the Company has since deleted).  The Report's conclusion is damning: JUUL's marketing was "patently youth-oriented."  Matt Myers, president of the Campaign for Tobacco-Free Kids observed: "It's impossible to review the data [in the paper] and conclude anything other than the marketing is the major reason this product became so popular among young people. As Massachusetts Attorney General Maura Healey said regarding her office's investigation into JUUL's marketing campaign: "This is about getting kids to start vaping, and make money and have them as customers for life."

25.     One effective strategy employed by JUUL was to hire social media influencers – people with large followings on Instagram – to promote JUUL's e-cigarette.

JUUL created hashtags – #JUUL, #JUULvapor, #switchtoJUUL, #vaporized.  As the Stanford Report found:

> JUUL has employed influencers – social media users with sizable followings recruited to increase brand awareness and to inspire sales.  Confirming that JUUL used influencers since its inception was a June 2015 listing for an Influencer Marketing Intern.  The job description makes clear: *"The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements … to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc."*

> Influencers are a form of paid promotion.  For example, an influencer may earn $1000 for each 100,000 followers.  A particularly well-documented example is that of DonnySmokes (Donny Karle, age 21), whose JUUL "unboxing" YouTube video garnered some 52,000 views.  With 120,000 subscribers on his YouTube channel, Mr. Karl was able to earn a good income stream from vapor companies before YouTube interrupted his channel.  In October 2018, JUUL's website still requests applications to *"Join the JUUL Influencers."*

26.     Social media influencers would post youth-targeted advertising, often featuring images of young people JUULing, with JUUL's hashtags.  Viral marketing campaigns pushed JUUL's products on children, teens, and young adults.

27.     In addition to the use of social media influencers, JUUL used an undisclosed "affiliate program" to attract customers to JUUL's website.  The Stanford Report describes the program:

> JUUL has used an affiliate program which makes payouts to online sites which refer business to them.  In the vaping industry, this most often takes the form of sites which review the product favorably and include a link to the product's website, especially to their *"buy now"* section.  JUUL partnered with the company Impact Radius (https://impact.com/) whose goal is to: *"optimize partner marketing investments."*  In their affiliation application, JUUL explained: *How it works: You get paid by advertising performance campaigns to your audience on your blog, website, newsletter, search landing page.  Depending on the specific terms of our agreement you can get paid as frequently as daily using direct deposit into your bank account.*  It goes on to specify: *"The purpose of this Agreement is to allow HTML linking between your web site and the JUULvapor.com web site"* and *"At all times, you must clearly represent yourself and your web sites as independent from JUULvapor.com."*

10

JUUL offers payment of as much as 25% of net sales for new customers and 10% of net sales for existing customers. On October 31, 2018 JUUL halted its affiliate program. JUUL did not wait for an internet admirer to apply to its affiliates program. In response to a complimentary tweet on JUUL's Twitter feed, the company replied with an invitation for the individual to join the affiliates program 18 times (15 in 2017 and 3 in 2018).

28.     In 2016, JUUL made some changes to its marketing, but the deception and intent to target youth remained. For instance, JUUL's marketing would often depict themes like socialization and romance or style and identity. Instagram and Facebook ads included photos of pop-star Katy Perry with a JUUL at the Golden Globes. But most glaring was what JUUL did not include in their advertising: adult smokers JUUL claimed it was targeting to switch from traditional cigarettes to JUUL.

29.     More recent changes to JUUL's marketing have included live testimonials from adults who claim to have switched from cigarettes to JUUL. But according to Dr. Robert K. Jackler, one of the Stanford Report's authors: "The JUUL hashtag lives on. It's immortal. It's still viral in peer-to-peer teen promotion." "The fact that Juul shut down its own social media postings had little effect," Dr. Jackler said.

30.     In January 2019, The Boulder Daily Camera published a front-page story about local educators' growing concerns over their students' use of JUUL. Five days later, the principal at Nederland Middle-Senior High School in Boulder, CO, Carrie Yantzer, received a surprising email from someone introducing themselves as Bruce Harter, a former educator. Mr. Harter claimed he was working with JUUL in developing anti-vaping curriculum for schools. Mr. Harter said he "read about the challenges you're having with JUUL" and offered a free, three-hour curriculum provided by JUUL purportedly aimed at discouraging vaping amongst teens. Ms. Yantzer was not the only school administrator to get such a letter. Not surprisingly, that very same tactic—purportedly educating youth about the dangers of a product in order to

11

surreptitiously market the product to them—was used by big tobacco in marketing traditional cigarettes.

31. JUUL would later—after it had addicted scores of teens to its product—claim its marketing was never geared towards youth. But as a former senior manager at JUUL has admitted, JUUL was "well aware it could appeal to [teenagers]." And, in fact, as JUUL's e-cigarettes went on sale in June 2015, it was quickly apparent that teenagers were seduced by the marketing and were picking up JUUL's addictive, harmful products in droves. It was evident to JUUL that teenagers were either buying JUUL e-cigarettes online or enlisting others to buy for them. Indeed, some customers purchased more JUUL products than one could use, sometimes 10 or more devices. The product's success amongst teens did not go unnoticed at JUUL. JUUL's co-founder, Adam Bowen, has admitted he was aware early on of the risks e-cigarettes posed to teenagers.

32. JUUL's social media, youth-focused marketing worked. The Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18. The National Youth Tobacco Survey has found that 78.2% of middle and high-school students - 20.5 million youth - had been exposed to e-cigarette advertisements.

33. JUUL's sales reached $1 million by December 2015. In 2017, JUUL's revenues grew by 700%. JUUL now controls 72% of the e-cigarette market.

34. In July 2019, JUUL raised $1.2 billion and has a current valuation of approximately $16 billion. In December 2018, Altria Group, Inc. ("Altria"), the parent of Phillip Morris USA, Inc. ("Phillip Morris") purchased a third of JUUL. Altria's announcement of its

stake in JUUL came just weeks after Altria announced it would remove its e-cigarette products from the market to address the youth vaping epidemic.

35. In exchange for Altria agreeing to provide certain paid services to JUUL for at least six years, Altria agreed to a non-competition obligation with JUUL. Altria and JUUL also entered into a services agreement.

36. Under the agreements, Altria will, among other things, provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping prevention, cigarette pack inserts and onserts, regulatory matters and government affairs. JUUL's access to Altria's retail shelf space will allow JUUL products to appear alongside traditional cigarettes like Marlboro, the country's most popular cigarette brand.

37. In addition, Altria subsidiary Philip Morris will send JUUL marketing messages to Phillip Morris's database of traditional cigarette smokers' mailing and email addresses.

38. According to Dr. Jackler: "The joining of JUUL and Marlboro brings together the two dominant players in the teenage nicotine addiction market (e-cigarette & cigarette). This powerful combination constitutes a clear and present danger to the youth America as well as those around the world."

**The E-Cigarette Epidemic**

39. The FDA characterizes teen vaping as an epidemic. Indeed, smoking remains the leading cause of preventable death in the U.S., killing more than 480,000 people a year. Each year, cigarette smoking causes about one in every five deaths in the U.S. If smoking were to continue at the current rate among U.S. youth, 5.6 million of today's Americans under the age of 18 years are anticipated to die prematurely from a smoking-related illness. This represents about one in every 13 Americans aged 17 years or younger who are alive today.

40.     According to a recent survey of adolescent drug use, 11% of 12th graders, 8.2% of 10th graders, and 3.5% percent of eighth graders had vaped nicotine in the previous 30 days. According to the Centers for Disease Control and Prevention ("CDC"), in 2017 2.1 million high-schoolers and middle schoolers used e-cigarettes.  That number rose by 1.5 million in 2018.  E-cigarette use increased 78% among high school students and 48% among middle school students from 2017 to 2018.  As CDC Director Dr. Robert R. Redfield explains: "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."

41.     An April 20, 2018 article in *The Wall Street Journal* titled "Schools and Parents Fight JUUL E-Cigarette Epidemic," described the problems parents and school were facing with the meteoric rise of nicotine use by America's youth:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a JUUL and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes.  It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> *        *        *
>
> After two decades of declining teen cigarette use, "JUULing" is exploding.  The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes.  JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette.  It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.

42.     A February 13, 2018 article published by the Lawrence (Kansas) Free State High School's Free Press Online, described the seduction of JUUL and students' growing addiction:

14

Since most vape juices contain nicotine, laws have been put in place to keep minors from using the potentially addictive substance. The Food and Drug Administration prohibits anyone under the age of 18 from using any kind of vape product. Despite the current legislation, many minors are still able to obtain vaping devices. At Free State, underage use of vapes is quite typical. Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully.

\*      \*      \*

One of the reasons why vaping has become so popular is the "cloud" the user makes after exhaling the substance. The vapor is cooler than a traditional cigarette, and some students are fascinated with the many different things you can do with it, an anonymous senior said.

"I think if you're doing it with people that you feel comfortable with then it's just a good time. People are fascinated by the cloud and the tricks." an anonymous senior said.

Another attractive characteristic of vaping is the buzz that the user gets after inhaling the substance. It can be described as a short-term head high.

"It's almost like being drunk—you feel it in your head and you just kind of wobble," senior Isaiah Jacobs said. "It's a dizzy feeling. It feels nice."
The buzz is caused by nicotine which the vape juice contains. To a new user, vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk.

"Some [people who vape] will admit it," senior Isaiah Jacobs said. "You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol."

Once hooked, users inhale the many toxins that compose vape juice. Very little research has been conducted on the long-term effects that vaping has on a person's body according to pulmonologist Aman Kahn.

"I would definitely not encourage any youth to smoke at all," Kahn said. "Whether in large or small concentrations, nicotine is harmful. The other liquids in vape juice, such as propylene glycol, are harmful as well. We simply don't know what harm these liquids can cause when heated up, but there is obviously a possibility for carcinogenic effects."

With so little information available, students are unable to make an informed decision about whether or not to partake in vaping. Until further research has been conducted, underage users will continue to consume vape products without understanding the impacts that these substances can have on their health.

43. JUUL's e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teen users. Nicotine is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

44. Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys. Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoking. Vaping also triggers immune responses associated with inflammatory lung diseases.

45. A study conducted by the American Journal of Medicine found that among young adults who did not smoke cigarettes, those who use e-cigarettes were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months. Evidence also suggest that nicotine can affect an adolescent's neurological development and that when adolescents are exposed to nicotine they are at an increased risk of nicotine addiction. According to the National Institutes of Health, the "amount and speed of nicotine delivery … plays a critical role in the potential for abuse of tobacco products." JUUL's e-cigarettes are the most potent on the market.

**Government Investigations**

46. In April 2019, the FDA announced it was investigating JUUL's marketing efforts. The FDA has requested JUUL's research and marketing documents, including focus

16

group data and toxicology reports.

47. On September 12, 2018, the FDA sent letters to five e-cigarette manufacturers that represent more than 97% of the current market. JUUL was among these manufacturers. Dr. Gottlieb, commissioner of the FDA, stated these companies are "now on notice by the FDA of how their products are being used by youth at disturbing rates." The FDA also requested "the manufacturers of these brands and products to come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors." Dr. Gottlieb ordered the companies to "demonstrate that they're truly committed to keeping these [e-cigarettes] out of the hands of kids and they must find a way to reverse this trend."

48. On October 4, 2018, JUUL stated it released 50,000 pages of documents to the FDA and that it "want[s] to be part of the solution in preventing underage use."

49. On November 14, 2018, JUUL announced a plan to combat underage use.

50. On November 15, the CDC revealed that e-cigarette use in general increased 78% among high school students and 48% among middle school students from 2017 to 2018. The FDA Commissioner called these results "astonishing."

51. On December 18, 2018, the Secretary of the U.S. Department of Health and Human Services, Alex Azar, stated at a press conference: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

## CLASS ALLEGATIONS

52. Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Missouri state law class ("the Class"):

> All persons who have used JUUL e-cigarettes or JUULpods in Missouri or, if
> such person is a legal minor, the parent or legal guardian of the minor. Excluded

from the class are owners, officers, directors, employees, agents and/or representatives of Defendant and its parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel, and members of their immediate families.

53. <u>Numerosity</u>. The members of the Class are so numerous and geographically dispersed that individual joinder of members is impracticable. The identity and precise number of Class members, which is unknown to Plaintiff but can be ascertained from the records of Defendant, is likely in the tens or hundreds of thousands.

54. <u>Commonality and Predominance</u>. This action involves common questions of law and fact, which predominate over any questions affecting only individual members of the Class. These common fact and legal questions include, but are not limited to:

a. The design and manufacture of JUUL e-cigarettes and JUULpods

b. The marketing of JUUL e-cigarettes and JUULpods;

c. The effects of nicotine use, including from JUUL e-cigarettes and JUULpods, on consumers including adolescents;

d. Whether Defendant was negligent;

e. Whether Defendant failed to warn consumers of the harmful effects of, including the likelihood of addiction, using JUUL products;

f. Whether JUUL products were defective;

g. Whether Defendant negligently represented that JUUL products were fit for their intended purpose;

h. Whether Defendant fraudulently represented that JUUL products were fit for their intended purpose;

i. Whether Defendant breached implied warranties to Plaintiff and the Class;

j. Whether Defendant breached express warranties to Plaintiff and the Class;

k. Whether Defendant negligently inflicted emotional distress on Plaintiff and the Class;

l.      Whether Defendant intentionally inflicted emotional distress on Plaintiff and the Class;

m.     Whether Plaintiff and the other members of the Class are entitled to personal injury damages;

n.     Whether Plaintiff and the other members of the Class are entitled to medical monitoring as compensable damages resulting from Defendant's tortious conduct; and

o.     Whether Plaintiff and the other members of the Class are entitled to appropriate equitable remedies;

55.    <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the other members of the Class because, inter alia, all Class members were injured through the same course of conduct alleged herein.

56.    <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no interests adverse or antagonistic to those of the Class.

57.    <u>Superiority</u>.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of

19

adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

58.     Propriety of Declaratory Relief. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### Count I

### Negligence

59.     Plaintiff incorporates by reference all preceding paragraphs 1 to 58.

60.     Defendant, directly or indirectly, caused JUUL products to be purchased and/or used by Plaintiff.

61.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

62.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using JUUL and appropriate, complete, and accurate

Case 4:19-cv-00674-HFS   Document 1   Filed 08/26/19   Page 20 of 31

warnings concerning the potential adverse effects of nicotine use and, in particular JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

63. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by continued use of nicotine, particularly among adolescents.

64. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and JUULpods could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

65. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risk of continued nicotine use and nicotine addiction.

66. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendant manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

21

67.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

68.     Defendant's negligence included:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing;

b.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not JUUL products were safe for their intended use;

c.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine;

d.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use its JUUL products;

e.      Failing to disclose to Plaintiff, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction;

f.      Representing that its JUUL products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

g.      Declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the risks of JUUL products and nicotine vaping;

h.      Advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of JUUL products and nicotine;

i.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's JUUL products are not unsafe for their intended use; and

j.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

69.      Defendant knew and/or should have known that it was foreseeable that users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

70.      Plaintiff did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids.

71.      Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

72.      Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of aggravated or punitive damages.

73.      As a proximate result of Defendant's wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous nature, Plaintiff has been injured and suffered economic damages and will continue to incur expenses in the future.

## Count II

## Intentional Infliction of Emotional Distress

74.      Plaintiff incorporates by reference all preceding paragraphs 1 to 73.

75.      Defendant placed into the stream of commerce defective and dangerous JUUL e-cigarettes and JUULpods knowing that such products were not fit for their intended purpose and

posed serious health risks to consumers. Defendant deceptively marketed, promoted, and distributed—often free of charge—JUUL products, concealing and misrepresenting the harmful effects of JUUL products, including the risk of nicotine addiction.

76. Defendant marketed JUUL products primarily to adolescents, a group Defendant knew was at an increased risk of harm resulting from the use of nicotine and an increased risk of nicotine addiction resulting from use of JUUL products. Defendant's use of social media influencers and celebrities to promote JUUL products appealed particularly to adolescents.

77. Defendants' act of placing defective and unreasonably dangerous JUUL products into the stream of commerce and marketing JUUL products in a deceptive nature was intended to cause extreme emotional distress whereby user of JUUL products unknowingly suffered adverse effects from the use of JUUL products and/or were placed at an increased and substantial risk of adverse health effects, some of which may be initially latent.

78. Defendants' actions were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

79. Defendants' actions were intended to and did cause severe emotional distress to Plaintiff and other members of the Class.

80. Defendants knew that users of JUUL products would suffer emotional distress upon learning that the JUUL e-cigarettes and JUULpods are defective and could cause attendant medial problems as described herein.

## Count III

## Negligent Infliction of Emotional Distress

81. Plaintiff incorporates by reference all preceding paragraphs 1 to 80.

82. Defendant placed into the stream of commerce defective and dangerous JUUL e-cigarettes and JUULpods knowing that such products were not fit for their intended purpose and posed serious health risks to consumers. Defendant deceptively marketed, promoted, and distributed—often free of charge—JUUL products, concealing and misrepresenting the harmful effects of JUUL products, including the risk of nicotine addiction.

83. Defendant marketed JUUL products primarily to adolescents, a group Defendant knew was at an increased risk of harm resulting from the use of nicotine and an increased risk of nicotine addiction resulting from use of JUUL products. Defendant's use of social media influencers and celebrities to promote JUUL products appealed particularly to adolescents.

84. Defendants' act of placing defective and unreasonably dangerous JUUL products into the stream of commerce and marketing JUUL products in a deceptive nature was intended to cause extreme emotional distress whereby user of JUUL products unknowingly suffered adverse effects from the use of JUUL products and/or were placed at an increased and substantial risk of adverse health effects, some of which may be initially latent.

85. Defendants' actions were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

86. Defendants' actions were intended to and did cause severe emotional distress to Plaintiff and other members of the Class.

87. Defendants knew that users of JUUL products would suffer emotional distress upon learning that the JUUL e-cigarettes and JUULpods are defective and could cause attendant medial problems as described herein.

**Count IV**

**Strict Product Liability – Failure to Warn**

88.     Plaintiff incorporates by reference all preceding paragraphs 1 to 87.

89.     Defendant manufactured, distributed and sold and promoted JUUL e-cigarettes, or have partnered to manufacture, distribute, sell and promote JUUL.

90.     At all times relevant, Defendant were well-aware of the dangers of nicotine addiction as described herein.

91.     At all times relevant, Plaintiff and members of the Class were not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

92.     In all forms of advertising, including but not limited to social media communications, Defendant failed adequately to warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction. Defendant failed adequately to warn in their advertising or anywhere on the product label that the product was not safe for minors, and instead, posed serious immediate and long-term health risks, and should not be used or consumed by them. Rather, Defendant intentionally marketed their products to minors in youth-friendly colors and flavors. Defendant also designed their products to be more palatable to youth and nonsmokers by making JUUL e-cigarettes easier to inhale while increasing the level of nicotine that is absorbed by users, making them even more addictive.

93.     The defects in JUUL's products, including the lack of warnings, existed at the time the JUULpods and devices were sold and/or when the JUULpods and devices left JUUL's possession or control.

94. JUUL's e-cigarettes and JUULpods were anticipated to be used by Plaintiff and the Class without substantial change in their condition from the time of their manufacture or sale.

95. Plaintiff and members of the Class were harmed directly and proximately by Defendant' failure to warn. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they have paid a premium as a result of Defendant' failure to warn.

## Count V

## Strict Product Liability – Design Defect

96. Plaintiff incorporates by reference all preceding paraphs 1 to 95.

97. Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which were intended by Defendant to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

98. Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including Plaintiff and members of the class.

99. As described herein, Defendant designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product. Because JUUL products deliver significantly more nicotine that Defendant represent, they are inherently defective.  In addition, because JUUL products are made to create and sustain addiction, they are unreasonably dangerous.  The risks inherent in the design of JUUL outweigh significantly any

27

benefits of such design.

100.     At all relevant times, Defendant could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

101.     At all relevant times, Plaintiff and the Class were unaware of the design defects described herein. Further, Defendant knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

102.     Plaintiff and members of the Class were harmed directly and proximately by Defendant' defectively designed JUUL e-cigarette and JUUL pods. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL products or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendant' defective products.

## Count VI

### Violation of Missouri Merchandising Practice Act, § 407.020 et seq.

103.     Plaintiff incorporates by reference all preceding paragraphs 1 to 102.

104.     At all relevant times, Plaintiff purchased and used JUUL for personal use.

105.     At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to JUUL products.

106.     At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of JUUL products, intentionally used deception, fraud, false

28

pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that JUUL products are safe for use.

107.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of JUUL products in trade or commerce.  In particular, Defendant failed to disclose to the public that the JUUL products are unsafe and pose serious health hazards.  Defendant was aware of the hazardous risks posed by JUUL products and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  The Defendant's failure to state material facts about JUUL products constitutes a violation of R.S.M.O. § 407.020.

108.    At all relevant times, Plaintiff was deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on social media, advertising materials, websites, and on product labels and packaging regarding the usage and safety of JUUL products.

109.    At all relevant times, Plaintiff acted in reasonable reliance upon the Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiff would not have purchased JUUL.

## Count VII

### Equitable Relief: Medical-Monitoring Program

110.    Plaintiff incorporates by reference all preceding paragraphs 1 to 109.

111.    As a direct and proximate result of Defendants' tortious acts described above, Plaintiff and the Class have a significantly increased risk of adverse health effects resulting from continued nicotine use, including but not limited to a significantly increased risk of nicotine addiction, restrictive airway disease, hypersensitivity pneumonitis, pneumonia, decreased

immune response to both bacterial and viral infections, behavioral addiction, or cardiovascular endothelial cell injury leading to myocardial infarction.

112.    Medical monitoring, to a reasonable degree of medical certainty, is necessary in order to diagnose properly the warnings signs of the health hazards posed by continued nicotine use.

113.    Plaintiff and the Class are entitled to compensatory damages to compensate for medical monitoring that is reasonably necessary as a result of Defendants' acts, including periodic medical examinations for the early detection and treatment of latent injuries caused by Plaintiff and the other Class members' continued use of JUUL products and exposure resulting exposure to nicotine and other harmful chemicals found in JUUL products.

114.    Plaintiff and the Class are further entitled to medical monitoring compensatory damages to fund research and education into the harmful effects of nicotine vaping and, in particular, consumption of the liquid in JUULpods, as well as funding notice members of the Class regarding such research and the reasonably necessary steps members of the Class should take to monitor and treat the significant health risks they face as a result of Defendants' acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

a.    Certifying the Class as requested herein;

b.    Awarding Plaintiff and Class members compensatory damages in an amount to be determined at trial;

c.    Ordering all appropriate equitable remedies, including but not limited to declaratory, injunctive and medical monitoring program relief;

d.    Awarding Plaintiff and Class members attorneys' fees and costs to the extent permitted by law; and

e.      Affording Plaintiff and Class members with such further and other relief as
        deemed just and proper by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.


Dated:  August 26, 2019                          Respectfully submitted,


                                                 */s/ Thomas P. Cartmell*
                                                 Thomas P. Cartmell, MO #45366
                                                 Jonathan P. Kieffer, MO #49025
                                                 Tyler W. Hudson, MO #53585
                                                 Wagstaff & Cartmell LLP
                                                 4740 Grand Avenue, Suite 300
                                                 Kansas City, MO  64112
                                                 Tel. (816) 701-1100
                                                 Fax (816) 531-2372
                                                 tcartmell@wcllp.com
                                                 jpkieffer@wcllp.com
                                                 thudson@wcllp.com


                                                 */s/ Kirk J. Goza*
                                                 Kirk J. Goza, MO #32475
                                                 Brad Honnold, MO #39818
                                                 Goza & Honnold LLC
                                                 9500 Nall Ave., Suite 400
                                                 Overland Park, KS  66207
                                                 Tel. (913) 451-3433
                                                 kgoza@gohonlaw.com
                                                 bhonnold@gohonlaw.com


                                                 *Attorneys for Plaintiff*